**HUNTWAY REFINING COMPANY,**
**Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF ENERGY, et al., Defendants.**

**No. CV 81–4370–FW.**

United States District Court,
C.D. California.

May 3, 1984.

Demetriou, Del Guercio & Lovejoy, Kevin R. Griffin, argued, Los Angeles, Cal., for plaintiff.

Alexander H. Williams, III, U.S. Atty., Joseph F. Butler, Asst. U.S. Atty., Los Angeles, Cal., Thomas H. Kemp, Marcia K. Sowles, argued, Dept. of Energy, Washington, D.C., for defendants.

## MEMORANDUM OF DECISION

WHELAN, Senior District Judge.

Plaintiff Huntway Refining Company's and defendants Department of Energy (DOE) and Donald Paul Hodel, Jr.'s cross motions for summary judgment came on regularly for hearing and were submitted on November 7, 1983. After reviewing the pleadings and memoranda of the parties, the record on file in this case, and after hearing and considering the arguments of

counsel in open court, the Court renders judgment in favor of defendants and against plaintiff.

Huntway is a small, independent refiner doing business in California. Hodel, the Secretary of Energy, was responsible for the administration of the DOE, which was responsible for the system of allocation and price control established by the Emergency Petroleum Allocation Act of 1973 and amendments, 15 U.S.C. § 751 *et seq.*

Part of the comprehensive program under the DOE's authority, the Entitlements Program was administered by the Economic Regulatory Administration (ERA) pursuant to 10 C.F.R. § 211.67 *et seq.* The program was intended to protect the oil industry, and small refiners in particular, from inequities resulting from refiners' variable access to price-controlled oil. Under the program, a refiner with greater access to less expensive, "deemed old oil" was required to purchase entitlements; a refiner whose monthly report indicated less access to old oil was required to sell entitlements. The value of an entitlement was fixed by the DOE each month to reflect price differentials among the categories of "old," "new," and "uncontrolled" oil.

Relief from "special hardship, inequity or unfair distribution of burdens" under the program was provided by the Department of Energy Organization Act, 42 U.S.C. § 7194(a). Likewise, the DOE regulations provided for exceptions from the program in cases of "serious hardship or gross inequity." 10 C.F.R. §§ 205.50, 205.52 and 205.12. These sections instruct the applicant for exception relief to direct a written request to the Office of Exceptions and Appeals, DOE, in Washington.

The DOE Organization Act provided two levels of administrative review of a denial of exception relief. An initial determination, by the Office of Hearings and Appeals (OHA), was subject to further review by the Federal Energy Regulatory Commission (FERC). After the FERC issued its final order, the agency decision was subject to judicial review. 42 U.S.C. § 7194(b).

When the entitlements program went into effect, it excluded from entitlements purchase obligations any oil acquired prior to the program's inception, in November 1974. For many refiners then in operation, this exempted from the program the normal operating reserve inventory. In 1975, the ERA began an informal practice, which was nowhere described in any rules or regulations, of granting new refiners exemptions from the duty to buy entitlements for a quantity of feedstock oil equivalent to from seven to twenty one days' operating supply. This put new refiners on the same footing as old firms, whose reserve inventory was never subject to the duty to buy entitlements.

In calculating the adjustment for excluding start-up inventories for new refiners, the ERA took into consideration the refinery's storage and processing capacity, as well as the volume and dependability of feedstock transportation used. The nature of this adjustment was commonly discussed with firms prior to their opening. Huntway was aware of this practice and had discussed the method of its calculation with ERA personnel prior to beginning construction of its refinery in January of 1979.

On January 19, 1979, the OHA decided the case of *Sierra Anchor*, 3 DOE ¶ 80,114, an appeal from an ERA-determined adjustment which the appellant considered inadequate. In *Sierra Anchor*, the OHA held that it could neither grant nor deny the relief sought, because the ERA was not authorized to make any start-up inventory adjustments under any existing regulations, and the OHA remanded with the suggestion to ERA that it consider a rulemaking with retroactive effect.

Rather than promulgate rules, the ERA continued over the next ten months to consider and discuss adjustments for up to 23 refiners and in various ways grant up to 14 applications. The record is not clear what actions were taken in several cases, but it appears to support Huntway's claim that it was the first new refiner given a start-up inventory adjustment calculated by a "runs

to stills" method, rather than a full exclusion adjustment.

Huntway filed its request for an exclusion adjustment with ERA on September 6, 1979. On October 11, 1979, it received a mailgram from ERA suspending all such requests. On November 26, 1979, Huntway filed an Application for Exception with OHA, requesting a full, start-up inventory exemption. On May 8, 1980, DOE's Proposed Decision and Order granted Huntway an adjustment, but unlike other refiners, Huntway was required to purchase entitlements for its full inventory in the amount of $1,137,609. OHA calculated Huntway's start-up inventory, and ordered that Huntway be issued entitlements with a value equal to the entitlements it would have been issued if that volume of oil were reported as crude oil runs to stills. This gave Huntway entitlements worth, at the time, $423,513. It is this different method of adjustment which Huntway complains cost it $714,096 more than the method applied by the ERA to prior new refiners would have cost. OHA's tentative decision was affirmed in OHA's final Decision and Order, issued September 30, 1980, and Huntway petitioned for review with the FERC. A hearing was held, and a Proposed Decision and Order affirming OHA was issued on July 16, 1981. Huntway filed comments thereon, and on December 11, 1981, FERC affirmed its Proposed Decision.

Huntway filed its complaint in this Court on August 25, 1981, charging in eight counts that the suspension, or denial to Huntway, of the full exclusion adjustment was an abuse of agency discretion, that it was a statutory violation, that DOE was estopped from suspending its practice or denying such an adjustment to Huntway, and that doing so amounted to a deprivation of Huntway's property without due process. Subsequent to a hearing on DOE's motion for summary judgment, this Court remanded the case to OHA to consider evidence obtained by Huntway through a Freedom of Information Act request, indicating that other refiners had received inventory exclusion adjustments after *Sierra Anchor*. OHA reviewed the extensive record and found that "in almost every instance" refiners receiving an exclusion adjustment after *Sierra Anchor* applied for the adjustment before that case appeared. OHA further found that even if the evidence showed that more post-*Sierra Anchor* exclusion adjustments were granted, Huntway would not be entitled to such an adjustment because the ERA's practice was unauthorized and "conferred what are, in our view, unwarranted entitlements benefits to the detriment of third parties."

The standard of this Court's review is confined to the questions of whether there was a rational basis for OHA's decision, whether the agency acted in excess of its authority or committed an abuse of discretion, or whether its determination is supported by substantial evidence. *See e.g., Husky Oil v. DOE,* 582 F.2d 644, 653 (TECA 1978).

■ The Court holds that the OHA's decision to apply a runs credit method of adjustment for start-up inventories was rationally based on a concern that a full exclusion adjustment invited abuses. Further, this decision was supported by substantial evidence that the runs credit method would provide a new refiner relief from the inequity of entitlements burdens on its start-up inventory, while foreclosing the opportunity for refiners to profit by over-reporting the amount of deemed old oil in their start-up inventories.

■ The attack by plaintiff on the validity of the change by DOE of the practice of granting a full exclusion adjustment to granting one based on a runs to stills credit is without merit. The ERA's past practice did not rise to the dignity of a rule in the absence of a regulation on the subject. *See Batterton v. Marshall,* 648 F.2d 694, 704 (D.C.Cir.1980); *Briscoe v. Kusper,* 435 F.2d 1046, 1055 (7th Cir.1970).

■ The government effectively negated Huntway's estoppel claim by pointing out that the government may not be estopped by acts or statements of its agents acting

outside the scope of their authority. *Salque v. United States*, 663 F.2d 968 (9th Cir.1981). Plaintiff cannot successfully assert that the DOE, in denying plaintiff the relief sought, abused its discretion or violated statutory procedural requirements for the reason that here we do not have a regulatory scheme that is silent on the ERA's practice of granting inventory adjustments. At the relevant time, the DOE's regulations gave no authority to grant such adjustments to ERA but instead gave authority to another agency within the DOE altogether. Exceptions relief is provided for by 10 C.F.R. § 205.50, directing the applicant not to ERA but to the Office of Exceptions and Appeals. The refusal of an agency to perpetuate actions taken by a renegade department cannot be considered an abuse of the agency's discretion when the authority to take the disputed actions is assigned by duly published regulations to a different department. The DOE may be faulted for failure to police the actions of its own personnel, but the DOE as a whole cannot be held accountable for, nor required to perpetuate, the ERA's unauthorized practice of granting full exclusion adjustments.

Huntway's due process claim is likewise without merit. The refiner had no property interest, nor a reasonable expectation thereof, in the kind of exception relief formerly granted by ERA. While other similarly situated refiners may have received different treatment even after *Sierra Anchor* and the October 11, 1979 mailgram, the existence of 10 C.F.R. 205.50 put Huntway on notice that ERA's practice of so treating other refiners was unauthorized. The regulations condified in 10 C.F.R. 205.50 were duly published in the Federal Register, and "[i]t is well settled that when regulations are published in the Federal Register they give legal notice of their contents to all who may be affected thereby." *Wolfson v. United States*, 492 F.2d 1386, 1392 (Ct.Cl.1974) (citations omitted). This is so despite the fact that the *Sierra Anchor* decision itself implied that ERA was the proper department for granting adjustments, when it suggested that ERA consider a rulemaking.

The foregoing constitutes the undisputed material facts and the Court's conclusions of law. This is a proper case for summary judgment. The defendants' motion is granted, and the plaintiff's motion is denied. The Court shall cause judgment to be entered in favor of defendants, but no judgment shall be entered until the Court has signed and caused to be filed its formal written judgment.